[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14723
Non-Argument Calendar
_____

D.C. Docket No. 3:10-cv-00749-RBD-TEM


RICCO BROWN,
a.k.a. Richardo Natalis Brown,
a.k.a. Ricco Recardo Brown,

                                                              Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

                                                              Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 8, 2014)

Before HULL, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

Ricco Recardo Brown, a Florida prisoner, serving a sentence of life imprisonment for armed burglary, aggravated battery, and aggravated assault, appeals the denial of his petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254. The district court dismissed Brown's petition on the ground that it was barred by the one-year statute of limitation in the Antiterrorism and Effective Death Penalty Act of 1996. The district court ruled that Brown failed to satisfy the threshold showing of actual innocence to obtain an equitable exception to that deadline. *See McQuiggin v. Perkins*, 569 U.S. ___, 133 S. Ct. 1924 (2013); *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995). Because Brown's DNA evidence fails to contradict the eyewitness identifications of him as the perpetrator of his crimes, we affirm.

## I. BACKGROUND

We divide the discussion into four parts. First, we discuss Brown's trial and direct appeal. Second, we discuss Brown's first and second motions for post-conviction filed in the Florida courts. Third, we discuss Brown's third state post-conviction proceeding during which he had a new DNA test performed on physical evidence introduced at his trial. Fourth, we discuss Brown's federal habeas corpus proceedings.

*A. Brown's Trial and Direct Appeal*

In 2002, Brown was tried in a Florida court for four crimes: armed burglary; the armed robbery of Melvin Wiggins Jr.; the aggravated battery of Melvin Wiggins Sr.; and the aggravated assault of Cheryl Wiggins. The Wiggins and two other occupants of the house, Michael Best and Nakita Leatherbury, testified that two armed men wearing Halloween masks entered the Wiggins' home and that Cheryl fought with and unmasked one of the men. Cheryl and Melvin Sr. positively identified the burglar as Brown. After the prosecution introduced the mask and a bandana that Cheryl had stripped off the burglar, the district court read a stipulation of facts about a DNA test performed on the mask. The parties stipulated that the mask was examined by the Florida Department of Law Enforcement Crime Lab "for the possible presence of DNA evidence"; "[n]o fingerprints were found on the mask"; "the DNA samples found were the results of multiple donors"; and "Brown could neither be identified or excluded as a possible donor of the DNA."

Cheryl and Melvin Sr. testified that Brown was the burglar who was unmasked. Cheryl testified that she recognized Brown's voice when he threatened her at gunpoint; she unmasked him while they were scuffling on the floor; and she was positive of her identification because she noticed his "weak eye" as he was laying on top of her. Cheryl stated that she had interacted with Brown when he

3

had visited the Wiggins' home occasionally with his girlfriend, Jessica Alexander; Cheryl had known Alexander for 15 years and babysat her daughter, Nakita Leatherbury; and Cheryl did not like Brown and had communicated that to Alexander. Melvin Sr. testified that he saw Cheryl struggling with a man in the dark; he was struck in the head with a gun when he pulled the man off Cheryl; and he realized that the man was Brown when a light shone on his face as he "backed up inside the kitchen." Cheryl and Melvin Sr. testified that they had Brown arrested when he returned to their home with Alexander later that evening.

Melvin Jr., Best, Nakita, a police officer, and Charles Smith, who was an acquaintance and fellow jailmate of Brown, also connected Brown to the burglary. Melvin Jr. and Best testified that they witnessed Cheryl fight with one of the burglars, who she referred to as "Ricco." Nakita testified that she admitted to the Wiggins' home two armed men who were wearing masks and who were looking for "Auntie Chubby," which was a nickname Nakita used to refer to Cheryl; thereafter she heard Cheryl yell "Ricco"; and one of the men fled bare-faced from the house. Although Nakita testified that she did not recognize the man, a police officer testified that Nakita had said that she saw Brown flee from the house after the burglary. Smith, Brown's jailmate, testified that he had known Brown for a few years and that Brown had approached him in jail, told him about the burglary, asked for assistance "to shake up one of the Wiggins," and offered Alexander's

4

assistance in bribing the Wiggins. Brown said that Alexander had suggested that Brown rob the Wiggins, and after the burglary, Alexander had agreed to provide Brown an alibi. Smith also testified that Brown described how he was admitted to the Wiggins' home by Nakita; his fight with and unmasking by Cheryl; and returning to the home with Alexander to act "like he didn't do anything."

Brown called Alexander as an alibi witness. Alexander testified that she had spent the evening of the burglary with Brown, who twice accompanied her to the Wiggins' home. According to Alexander, she visited the home before the burglary and allowed Nakita to stay longer to play in the Wiggins' house. During this first visit, Alexander avoided making contact with Cheryl because she disliked Brown. When Alexander returned to the house after the burglary, the Wiggins and the police "rushed out" and arrested Brown, although Alexander insisted that she had been with Brown throughout the evening.

The jury found Brown guilty of armed burglary, the aggravated battery of Melvin Sr., and the aggravated assault of Cheryl. Later, the trial court sentenced Brown to imprisonment for life. Brown appealed his convictions and sentence, and on October 27, 2003, the First Circuit Court of Appeals affirmed. *Brown v. State*, 857 So. 2d 881 (Fla. Dist. Ct. App. 2003).

*B. Brown's First and Second Motions for Post-Conviction Relief*

On September 24, 2004, Brown filed in a Florida court a motion for post-conviction relief and argued that his trial counsel was ineffective. *See* Fla. R. Crim. P. 3.850. On May 16, 2005, the state court denied Brown's motion. The court ruled that Brown's motion was factually deficient because he had failed "to allege, much less establish, that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance . . . ." Brown did not appeal.

On October 13, 2005, Brown filed a second motion that raised the same claim for post-conviction relief. *See id.* A Florida court denied Brown's motion as "procedurally barred" on the ground that it failed to "set forth any basis upon which . . . [to] conclude that the matters therein could not have been raised through the September, 2004 motion." Brown appealed, and the First Circuit Court of Appeals affirmed. *Brown v. State*, 961 So. 2d 936 (Fla. Dist. Ct. App. 2007).

*C. Brown's Third Motion for Post-Conviction Relief and the New DNA Test*
*Performed on the Mask and Bandana*

On December 7, 2006, Brown filed *pro se* a third motion for collateral review and requested assistance in having new DNA tests administered on the mask and bandana. A Florida court summarily denied Brown's motion, and he appealed. The First Circuit Court of Appeals reversed and remanded the case with instructions. *Brown v. State*, 967 So.2d 398, 399 (Fla. Dist. Ct. App. 2007).

6

On remand, the state court granted Brown's motion to test the physical evidence. The court appointed counsel, an assistant public defender, to represent Brown, and the court instructed counsel to prepare for an evidentiary hearing.

DNA Labs International tested the mask and the bandana using Y-STR analysis, which had been unavailable at the time of Brown's trial. The test enables scientists to isolate DNA containing the male Y chromosome and to determine the statistical probability of a particular man being the contributor of DNA evidence based on short tandem repeat (STR) sequences on the Y chromosome. DNA Labs tested the swabbings of the mask and a cutting from the bandana that had been tested by the crime lab. With the swabbings of the mask, DNA Labs was able to develop a partial Y-DNA profile that "indicate[d] a mixture of at least four male individuals" and that excluded Brown as a contributor to that DNA. With the cutting from the bandana, the laboratory developed a partial Y-DNA profile that "indicate[d] a mixture of two male individuals" and that could not exclude Brown as a contributor to that DNA.

On May 19, 2008, Brown moved *pro se* for a new trial. Brown argued that he was actually innocent based on the evidence that he was not a contributor to the DNA on the mask. During an evidentiary hearing, the parties discussed with the state court the results of both the mask and the bandana. Brown's counsel said that

he lacked a "good faith basis to file a motion for a new trial on Mr. Brown's behalf" because the test results were not exculpatory.

The state court denied Brown's motion for a new trial. The court ruled that the results of the Y-STR test "did not, does not and [could not] exonerate" Brown "[t]aken in conjunction with the testimony adduced at trial from both victims." The court reasoned that, "while the latest DNA testing results could qualify as new and material evidence, there [was] no realistic probability that [the new DNA evidence] would change the verdict or finding of the court at the original trial" because those test results "corroborate[d] the previous information that DNA testing could neither confirm nor exclude [Brown] as the perpetrator" and "detract[ed] none from the significant weight of the evidence used at trial to convict him." Brown appealed, and on June 25, 2009, the First Circuit Court of Appeals affirmed summarily. *Brown v. State*, 12 So. 3d 222 (Fla. Dist. Ct. App. 2009).

### D. Brown's Federal Habeas Corpus Proceedings

On August 18, 2010, Brown filed a federal petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254. Brown argued that the Florida courts violated his rights to due process and equal protection under the Fifth and Fourteenth Amendments by "allow[ing] [him to be] convict[ed] contrary to [the] law and weight of [the] evidence" and by denying his motion for a new trial when he "is

actually innocent [] both legally and factually."  Brown also argued that the prosecutor presented false testimony from Smith.  *See Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972).

The State responded that Brown's petition was barred by the one-year statute of limitation, *see* 28 U.S.C. § 2244(d)(1), and Brown replied that his petition was timely.  Brown argued that the State miscalculated the period of limitation.  In the alternative, Brown argued that he had substantial evidence of actual innocence entitling him to an equitable exception to the deadline and that he was entitled to a review on the merits of his claims about the violation of his constitutional rights. The district court appointed counsel for Brown, who obtained an expert, Dr. Gary W. Litman, to interpret the results of the DNA tests performed by the crime lab and by DNA Labs.

The district court held an evidentiary hearing to assess the new DNA evidence.  Brown did not request that Dr. Litman attend the hearing, so the district court continued the proceeding.  When the hearing resumed about a month later, Dr. Litman testified about the results of the tests performed by the crime lab and DNA Labs on the bandana and on the mask.  With respect to the bandana, Dr. Litman explained that the DNA test performed by the crime lab did not produce a reportable result because it could not "resolve a pattern, a DNA typing pattern." When DNA Labs tested the bandana using the Y-STR test, the lab found that there

was more than one contributor [of DNA] to the bandana" and that Brown could not be excluded as a contributor. Dr. Litman cautioned that the result reported by DNA Labs was of "very limited probative value" because it had found only 2 out of 16 alleles that matched Brown. With respect to the mask, Dr. Litman said that he had seen internal documents of the crime lab stating it had "includ[ed] certain data that in retrospect [it] should not have been including" and that DNA Labs thought the crime lab had "calculated incorrectly" its data. But Dr. Litman failed to explain how the purported miscalculation affected the test results reported by the crime lab. Dr. Litman explained that DNA Labs found that there were four contributors of DNA on the mask and that Brown was excluded as a contributor to that DNA. Dr. Litman acknowledged that Brown could have left DNA on another part of the mask that went undetected and that Brown could have worn the mask without transferring any DNA because that evidence "might not transfer through" another layer, such as a bandana.

The district court denied Brown's petition. The district court ruled that Brown's petition was untimely because he filed his petition after the expiration of the one-year statute of limitation; he was not entitled to equitable tolling of the statutory deadline; and he failed to file his petition within one year of obtaining the new DNA evidence. The district court also ruled that Brown was not entitled to an equitable exception to the deadline based on his claim of actual innocence. The

10

district court determined that Brown had failed to prove that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," *Kuenzel v. Comm'r, Ala. Dep't of Corr.*, 690 F.3d 1311, 1314–15 (11th Cir. 2012) (quoting *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867), because the new DNA test results did not contradict Cheryl's and Melvin's testimonies and because of the possibility, as acknowledged by Litman, that Brown could "wear a . . . bandana and not leave DNA on the mask." Nevertheless, the district court determined that reasonable jurists could disagree about its decision and granted Brown a certificate of appealability.

## II. STANDARDS OF REVIEW

We review *de novo* the denial of a petition for a writ of habeas corpus. *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1009 (11th Cir. 2012). The scope of our review is limited to the issue identified in the certificate of appealability. *McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011). "We also do not consider issues or arguments raised for the first time on appeal." *Ferguson v. Sec'y for the Dep't of Corr.*, 580 F.3d 1183, 1193 (11th Cir. 2009).

## III. DISCUSSION

Brown appeals the denial of federal habeas corpus relief on two grounds. First, Brown argues that his trial counsel was ineffective, but we will not consider an issue that is not included in the certificate of appealability and that Brown failed

to raise in his federal habeas petition.  *See McKay*, 657 F.3d at 1195; *Ferguson*, 580 F.3d at 1193.  Second, Brown argues that the district court reviewed his claim of actual innocence under an incorrect legal standard and that the results of the new DNA test "creates a cavalcade of reasonable doubt . . . so powerful as to require an examination of the . . . [otherwise] procedurally defaulted constitutional claims in [his] [p]etition."  We conclude that the district court applied the correct test to assess Brown's claim of actual innocence, *see McQuiggin*, 133 S. Ct. at 1928, and that the district court did not err in its determination that Brown failed to prove it was "more likely than not that no reasonable juror would have convicted him in the light of the new evidence," *see id.* at 1935 (quoting *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867).

In *McQuiggin*, the Supreme Court held that a federal habeas petitioner can qualify for an equitable exception to the one-year statute of limitation and obtain federal review of his claims about constitutional errors in his state court proceedings if he satisfies the threshold test established in *Schlup*.  *McQuiggin*, 133 S. Ct. at 1928.  Under that test, the petitioner must "persuade[] the [habeas] court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  *Id.* (quoting *Schlup*, 513 U.S. at 329, 115 S. Ct. at 868).  The test devised in *Schlup* is intended to "ensure[] that [the] petitioner's case is truly extraordinary, while still provide petitioner a

12

meaningful avenue by which to avoid a manifest injustice." 513 U.S. at 327, 115 S. Ct. at 867 (internal quotation marks and citation omitted). The petitioner must prove that "he is 'actually innocent,'" *id.* at 327, 115 S. Ct. at 867, by producing "new reliable evidence . . . not presented at trial," *id.* at 324, 115 S. Ct. at 865, that "raise[s] sufficient doubt about [his] guilt to undermine confidence in the result of the trial," *id.* at 317, 115 S. Ct. at 862.

A determination of actual innocence is based on an assessment of "the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Id.* at 332, 115 S. Ct. at 869; *see House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006). In its assessment, the district court cannot make "an independent factual determination about what likely occurred"; instead, it is required to "assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538, 126 S. Ct. at 2077. "[T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory," and "make a probabilistic determination about what reasonable, properly instructed jurors would do,'" *House*, 547 U.S. at 538, 126 S. Ct. at 2077 (citing *Schlup*, 513 U.S. at 327–29, 115 S. Ct. at 867–68), if they "consider[ed] fairly all of the evidence presented," *Schlup*, 513 U.S. at 329, 115 S. Ct. at 868. As part of that determination, the district court must account for how "reasonable triers of fact"

would use the newly presented evidence to assess the "credibility of the witnesses presented at trial." *Id.* at 330, 115 S. Ct. at 868.

The district court applied the predictive standard of *Schlup* to evaluate Brown's claim of actual innocence. The district court stated repeatedly in its order that it had considered the new DNA test results and the evidence presented at Brown's trial to determine whether "it was more likely than not that no reasonable juror" would have convicted Brown. Although the district court referred once to the standard applicable to challenges to the sufficiency of the evidence, the district court explained that "the gateway actual-innocence standard [was] by no means equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)," and that it was "[i]nstead . . . [required to] assess how reasonable jurors would react to the 'overall, newly supplemented record.' *House v. Bell*, 547 U.S. 518, 538 (2006)." And the district court made a "probabilistic determination" about how reasonable jurors would evaluate the new DNA test results and their interpretation by Dr. Litman in connection with Cheryl's and Melvin Sr.'s positive identifications of Brown.

Brown's new evidence fails to satisfy the threshold showing under *Schulp*. The new DNA test results do not prove that Brown did not wear the mask left at the scene or contradict the testimony from Cheryl and Melvin Sr. identifying Brown as a burglar. Although the results exclude Brown as a contributor of DNA

14

on the mask, Brown's expert, Dr. Litman, acknowledged that Brown could have left DNA on another part of the mask. Regardless of the results of the DNA test on the bandana, Cheryl testified that Brown was wearing a bandana under his mask, a bandana was found at the scene with the mask, and Dr. Litman acknowledged that a bandana worn under a mask could prevent DNA from transferring to the mask.

Brown failed to prove "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." All of the evidence, both old and new, fails to establish that Brown is actually innocent. *See House*, 547 U.S. at 538, 126 S. Ct. at 2077; *Schlup*, 513 U.S. at 327–30, 115 S. Ct. at 867–68. The new DNA test results do not eliminate Brown as the burglar who wore the mask or contradict Cheryl's and Melvin Sr.'s positive identification of Brown as the perpetrator. And other eyewitnesses' accounts point to Brown's involvement. Those accounts establish that Cheryl called the perpetrator by Brown's first name and that the burglars referred to Cheryl by a nickname used by Nakita, the young daughter of Brown's girlfriend.

Brown's federal habeas petition is barred by the one-year statute of limitation. Brown failed to file his petition within one year after his conviction became final. *See* 28 U.S.C. § 2244(d)(1). And Brown has failed to prove that he is entitled to an equitable exception from that deadline based on his claim of actual innocence. *See McQuiggin*, 133 S. Ct. at 1928.

We **AFFIRM** the dismissal of Brown's petition.