FILED
United States Court of Appeals
Tenth Circuit

November 25, 2024

Christopher M. Wolpert
Clerk of Court

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

CHRISTOPHER K. BLACKLOCK,

  Petitioner - Appellant,

v.

DAN SCHNURR,

  Respondent - Appellee.

No. 24-3125
(D.C. No. 5:23-CV-03253-JWL)
(D. Kan.)

_____

## ORDER DENYING CERTIFICATE OF APPEALABILITY[*]
_____

Before **BACHARACH**, **McHUGH**, and **FEDERICO**, Circuit Judges.
_____

The district court dismissed Petitioner Christopher K. Blacklock's 28 U.S.C.

§ 2254 habeas petition, concluding that the petition was time-barred and that the actual

innocence exception did not apply. Appearing pro se,[1] Mr. Blacklock seeks a certificate

of appealability ("COA") to challenge the dismissal. Because the district court's

conclusion is not reasonably debatable, we decline to issue a COA and dismiss this

matter.

---

[*] This order is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[1] Because Mr. Blacklock is proceeding pro se, we construe his filings liberally. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, we cannot construct arguments for him. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

## I.  BACKGROUND

### A.  *Factual History*

On September 6, 2010, Mr. Blacklock, Leshaun Curtis, Ziahdrick Williams, and Eric Blake Eakin began driving from Texas to Iowa. They were transporting marijuana that they planned to sell in Iowa. The group used two vehicles for the trip. One vehicle—the "load car"—had a tire stashed with marijuana in the trunk. ROA Vol. II at 2272. The other vehicle was the "decoy car," which the men used to divert attention away from the load car. *Id.* During the drive to Iowa, Mr. Eakin and Mr. Blacklock drove the load car, while Mr. Williams and Mr. Curtis drove the decoy car.

In Iowa, Mr. Curtis sold the marijuana while the others waited at a Walmart. When Mr. Curtis opened the tire concealing the stash, he realized the quantity and quality of the marijuana was less than he had anticipated. As a result, he received less money than he had hoped.

After Mr. Curtis sold the load, the group went to a convenience store to divide the money. Mr. Curtis gave Mr. Eakin and Mr. Blacklock $700 each and kept approximately $3,200 for himself so he could purchase more marijuana. According to Mr. Curtis, everyone was "cool" with the amount they received, although they were expecting more. ROA Vol. III at 735.

On the return trip to Texas, Mr. Williams drove one vehicle with Mr. Blacklock in the front passenger seat. Mr. Curtis drove the other vehicle with Mr. Eakin as his passenger. At 6:37 a.m. on September 7, Mr. Curtis called Mr. Williams, and the two

2

men spoke for a couple of minutes. After their conversation ended, Mr. Blacklock tried to call Mr. Eakin multiple times, but Mr. Eakin did not answer his phone.

A few minutes after the phone call between Mr. Curtis and Mr. Williams, Mr. Blacklock stabbed Mr. Williams multiple times. Kansas Highway Patrol Trooper Gregory Smith was traveling a few cars behind Mr. Curtis and Mr. Williams, and he saw their vehicle veer off the road, return to the road, cross three lanes of traffic, and come to a stop after hitting a concrete barrier. Mr. Williams, who was bleeding profusely, exited the vehicle and began running toward Trooper Smith, who had also stopped. Mr. Blacklock also exited the vehicle and began chasing Mr. Williams. Trooper Smith ordered both men to the ground, and Mr. Williams complied, but Mr. Blacklock hesitated.

Trooper Smith eventually handcuffed Mr. Blacklock and found the knife he used to stab Mr. Williams. When he found the knife, Mr. Blacklock said, "That's what I stabbed him with," "I did what I had to do because I've got kids," "He was going to kill me," and "There's a dead body in a car with Texas tags on it." *Id.* at 2273. Another trooper arrived, and Mr. Blacklock repeated similar sentiments, stating, "His home boy killed my home boy and he was about to do me" and "White boy dead in a car going back to Texas. It's got Texas plates. They were about to kill me at the next convenience store." *Id.* at 2274.

Shortly thereafter, Mr. Curtis and Mr. Eakin arrived on scene. They had turned around because they could not see Mr. Williams and Mr. Blacklock behind them and because the two men were not answering their phones. When Mr. Blacklock saw them,

3

he asked Mr. Eakin why he had not answered his phone and explained that he believed Mr. Curtis had killed Mr. Eakin and taken his money from the marijuana sale.

Mr. Blacklock was then transported to a nearby medical center where he was interviewed by a police detective. That interview occurred intermittently over the course of four hours. After being examined by a doctor, Mr. Blacklock was arrested, transported to a police station, and interviewed again. During these interviews, Mr. Blacklock explained why he chased Mr. Williams after stabbing him: "Because I wanted to kill him, no matter what, I wanted to kill him because I thought he was going to kill me." ROA Vol. III at 901. He also made the following statements: "He was nodding off on the road, trying to go to sleep on the road so I put him to sleep on the road," "Actually, I would have been mad if he would have been alive. I would have been – he doesn't even deserve the next breath," "They want all this money, well, they're going to get it," "I wasn't going to be next," and "I don't have a problem killing trash but I don't understand why I can't kill this fool." *Id.* at 901–03.

Meanwhile, back at the interstate, another law enforcement officer had arrived and provided medical aid to Mr. Williams. To better assess his injuries, the officer cut off Mr. Williams's clothing and found a "wad of money" in his pants pocket and a knife in his front left pants pocket. *Id.* at 647. Mr. Williams ultimately died from the stab wounds.

### B.    *Procedural History*

#### 1.    **Trial and Direct Appeal**

The State of Kansas charged Mr. Blacklock with one count each of first-degree murder, possession with intent to distribute marijuana, and possession of drug

paraphernalia. The case proceeded to a jury trial, and Mr. Blacklock admitted that he stabbed Mr. Williams but argued he acted in self-defense. Specifically, Mr. Blacklock argued he reasonably believed that Mr. Curtis had killed Mr. Eakin and that Mr. Curtis and Mr. Williams were planning to kill him at the next stop.

In addition to the information described above, the jury heard evidence that Mr. Williams had nineteen wounds, yet Mr. Blacklock had only minor injuries on his finger, which were from his own knife. The jury also heard the audio recordings of Mr. Blacklock's interview at the medical center and watched the video recording of Mr. Blacklock's interview at the police station.

Mr. Blacklock testified and explained why he believed Mr. Curtis had killed Mr. Eakin. He explained that when Mr. Williams and Mr. Curtis spoke on the phone, he could only hear Mr. Williams's end of the conversation, and based on what he heard, he believed they were discussing Mr. Eakin's death and killing Mr. Blacklock at a convenience store. Moreover, he could not see Mr. Eakin in the vehicle, and Mr. Eakin did not answer his phone. But on cross-examination, Mr. Blacklock confirmed that he could see into Mr. Curtis and Mr. Eakin's vehicle, and he did not see anything indicative of Mr. Curtis stabbing or shooting Mr. Eakin. Furthermore, Mr. Curtis testified that he and Mr. Williams did not talk about killing Mr. Blacklock—instead, they talked about how Mr. Eakin was sleeping and discussed a plan to stop for food.

The jury also heard evidence about whether Mr. Williams was carrying a gun. Mr. Curtis testified that before they left Texas, he told everyone that "[d]rugs and guns don't mix" and had "everybody show everybody" that they did not have a gun. ROA

5

Vol. III at 734. Mr. Blacklock, however, testified that at Walmart, he saw a "perfect outline of a pistol" in Mr. Williams's left-side pants pocket. *Id.* at 928. And right before the stabbing, Mr. Blacklock explained, Mr. Williams exited the fast lane and reached towards his left pocket. Mr. Blacklock testified that this movement led him to believe Mr. Williams was reaching for his gun, so he stabbed Mr. Williams.

Mr. Blacklock further testified that before handcuffing him, Trooper Smith went to Mr. Williams's body, removed a handgun from Mr. Williams's pocket, and put the gun in his patrol car. Trooper Smith denied ever going to Mr. Williams's body and denied finding any guns on scene. Similarly, the detective who interviewed Mr. Blacklock confirmed that Mr. Blacklock did not mention Mr. Williams having a gun or Trooper Smith taking a gun from Mr. Williams.

The jury also heard evidence that Mr. Williams was a member of the Crips gang. For example, Mr. Blacklock said that when they were talking about the Crips, Mr. Williams asked, "Do you think you can just straight up kill a bitch?" *Id.* at 930. Mr. Blacklock testified that he believed this meant Mr. Williams had killed somebody. Similarly, in his recorded interview at the police station—which the jury heard— Mr. Blacklock stated that Mr. Williams bragged about killing "college girls." *Id.* at 609. And Mr. Blacklock told the jury that Mr. Williams had recently been released from jail, although he did not say why Mr. Williams was in jail.

At the conclusion of trial, the jury found Mr. Blacklock guilty of second-degree murder, possession with intent to distribute marijuana, and possession of drug paraphernalia. The district court sentenced Mr. Blacklock to 311 months' imprisonment.

6

Mr. Blacklock filed a direct appeal, and the Kansas Court of Appeals affirmed his convictions. *State v. Blacklock*, No. 107,466, 2014 WL 3731885 (Kan. Ct. App. July 15, 2014). Mr. Blacklock then petitioned for review by the Kansas Supreme Court, but his petition was denied on June 29, 2015. Mr. Blacklock did not file a petition for certiorari in the United States Supreme Court.

**2.     State and Federal Habeas Proceedings**

On June 8, 2016, Mr. Blacklock filed a motion in Kansas state court seeking habeas relief under Kan. Stat. Ann. § 60-1507. The district court denied habeas relief and Mr. Blacklock appealed. The Kansas Court of Appeals affirmed the district court, and on November 23, 2022, the Kansas Supreme Court denied Mr. Blacklock's petition for review. *Blacklock v. State*, No. 122,738, 2021 WL 5991884 (Kan. Ct. App. Dec. 17, 2021).

On November 15, 2023, Mr. Blacklock petitioned for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the District of Kansas. The district court issued an order to show cause why the petition should not be dismissed, explaining that it was filed outside the one-year limitation period established in 28 U.S.C. § 2244(d).[2] The district court further explained that the limitation period may be subject to equitable tolling under the actual innocence exception.

---

[2] As the district court explained, the one-year limitation period began running on September 29, 2015, but was tolled from June 8, 2016, through November 23, 2022, while Mr. Blacklock sought relief in state court. Accordingly, the one-year deadline was March 16, 2023, yet Mr. Blacklock did not file his federal habeas petition until November 15, 2023.

Mr. Blacklock filed a response, asserting that his petition was timely and that the actual innocence exception applied because new evidence showed he acted in self-defense. The district court concluded the petition was untimely but that Mr. Blacklock identified the following as new evidence showing his actual innocence: "(1) portions of state-court transcripts; (2) caselaw; (3) an argument that the Kansas courts lacked jurisdiction and that two of his convictions were not supported by sufficient evidence; (4) an affidavit completed by [Mr. Blacklock]; (5) evidence of [Mr.] Williams' criminal history; and (6) statements from Ronrico Nesbitt." ROA Vol. I at 346.

The district court declined to consider the transcripts, caselaw, and legal arguments because those are not the types of "new reliable evidence" that can support an actual innocence claim. *Id.* Next, the district court declined to consider Mr. Blacklock's affidavit, which claimed that the trial prosecutor went to high school with him, was a member of the Crips gang, and was involved in the murder of a police officer. The court did not consider the affidavit because it was unreliable and because it concerned prosecutorial bias, not whether Mr. Blacklock was innocent because he acted in self-defense.

Nevertheless, the district court concluded that two items of evidence could possibly establish Mr. Blacklock's innocence: (1) Mr. Williams's prior conviction for aggravated assault with a handgun and (2) Mr. Nesbitt's statements purporting to show that Mr. Williams and Mr. Curtis were planning to kill Mr. Blacklock. The court thus ordered Respondent Dan Schnurr to file a response addressing whether Mr. Blacklock's petition was timely and whether he is entitled to the actual innocence exception.

8

Mr. Schnurr argued that the petition was untimely and that Mr. Blacklock was not entitled to the actual innocence exception. Mr. Schnurr conceded that both items of evidence were new and that the criminal history was reliable, but he argued that Mr. Nesbitt's statements were unreliable. But regardless, Mr. Schnurr argued, neither item of evidence would have had a meaningful impact on the jury's verdict. Mr. Blacklock filed a response challenging Mr. Schnurr's view of the evidence.

The district court agreed with Mr. Schnurr, concluding that even if the evidence was reliable, it was not sufficient to state a credible claim of actual innocence. Thus, the court dismissed Mr. Blacklock's petition as time-barred and declined to issue a COA. Mr. Blacklock timely appealed.

## II.    DISCUSSION

Mr. Blacklock must obtain a COA before he can appeal. 28 U.S.C. § 2253(c)(1)(A); *Montez v. McKinna*, 208 F.3d 862, 867 (10th Cir. 2000) (holding "that a state prisoner must obtain a COA to appeal the denial of a habeas petition . . . filed pursuant to § 2254"). To obtain a COA, Mr. Blacklock must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added).

Mr. Blacklock has failed to meet his burden because he has not established that the district court's actual innocence ruling is reasonably debatable.[3] We first explain the actual innocence standard and then evaluate the new evidence that Mr. Blacklock claims establishes his innocence.

### A.    Actual Innocence Standard

To overcome the time-bar, a habeas petitioner may assert a claim of actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). Thus, "'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

Petitioners asserting actual innocence must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "New reliable evidence" includes "any reliable evidence not presented to the jury," even if it was previously available. *Fontenot v. Crow*, 4 F.4th 982, 1032–33 (10th Cir. 2021).

If the evidence is new and reliable, then the habeas court should evaluate the petitioner's claim by considering "'"all the evidence,"' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of

---

[3] On appeal, Mr. Blacklock does not argue his petition was filed within the one-year limitation period. Accordingly, we limit our review to the district court's actual innocence ruling.

admissibility that would govern at trial.'" *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327–28). After considering all the evidence, the court must determine whether "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. Put differently, "a petitioner's burden at the gateway stage is to demonstrate 'that more likely than not any reasonable juror would have reasonable doubt.'" *Fontenot*, 4 F.4th at 1030 (quoting *House*, 547 U.S. at 538).

Under this standard, a court is not required to have "'absolute certainty about the petitioner's guilt or innocence'—that is, a petitioner need not make 'a case of conclusive exoneration.'" *Id.* (quoting *House*, 547 U.S. at 538, 553). Accordingly, a "petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." *Schlup*, 513 U.S. at 331. Nevertheless, the actual innocence standard is "demanding and permits review only in the "'extraordinary'" case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327).

### B.     New Reliable Evidence

Mr. Blacklock identifies two new items of evidence—Mr. Williams's criminal history and Mr. Nesbitt's statements.[4] We address each item in turn.

---

[4] At the end of his appellate brief, Mr. Blacklock lists other evidence and arguments, such as alleged errors in the jury instructions, alleged *Brady* violations, and alleged prosecutorial misconduct. The list's purpose is unclear—many of the list items appear to be constitutional claims (not actual-innocence gateway claims), and Mr. Blacklock does not argue the district court erred by not considering these items. Accordingly, we limit our review to the new evidence considered by the district court.

### 1.    Mr. Williams's criminal history

The first item of new evidence is Mr. Williams's prior conviction for aggravated assault with a handgun. The district court concluded that although this evidence is new and reliable, it is not more likely than not that had the jury considered the assault conviction, a reasonable juror would have had reasonable doubt. This conclusion is not reasonably debatable.

The jury was instructed that Mr. Blacklock's use of deadly force was lawful only if he "reasonably believe[d]" such force was necessary. ROA Vol. III at 1133. It was further instructed, "Reasonable belief requires both a belief by the defendant and existence of facts that would persuade a reasonable person to that belief." *Id.* As the district court explained, Mr. Williams's assault conviction was irrelevant to whether Mr. Blacklock believed force was necessary because at the time of the stabbing, Mr. Blacklock was unaware of the assault conviction.

On appeal, Mr. Blacklock does not explain why the assault conviction would have been relevant to his subjective belief. However, he does argue that the conviction would have shown Mr. Williams "was capable of assault with a deadly weapon." Appellant's Br. at 2. But other evidence at trial demonstrated that Mr. Williams was capable of such violence. For example, the jury heard evidence that Mr. Williams was a Crip and had recently been in jail. And Mr. Blacklock testified about a conversation he had with Mr. Williams that led him to believe Mr. Williams had killed people for money. Lastly, the jury heard a recording of a police interview where Mr. Blacklock claimed that Mr. Williams bragged about killing "college girls." ROA Vol. III at 609. Mr. Blacklock

12

does not even attempt to explain why this evidence was insufficient to demonstrate that Mr. Williams "was capable of assault with a deadly weapon." Appellant's Br. at 2.

Considering all the evidence, it is not reasonably debatable that had the jury considered Mr. Williams's assault conviction, it is *not* more likely than not that any reasonable juror would have reasonable doubt.

### 2.    Mr. Nesbitt's Statements

The second category of new evidence is statements attributed to Mr. Nesbitt, a man who purportedly met both Mr. Curtis and Mr. Blacklock in county jail. These statements come from two different items: a signed but unnotarized affidavit from Mr. Nesbitt and a letter from Barbara Wynette Baker.

In the affidavit, Mr. Nesbitt states:

> I was in the same pod with [Mr.] Curtis. An[d] he told me the story about him and [Mr.] Blacklock. That the[y] drove to [Iowa] to drop off drugs. An[d] he was [supposed] to leave [Mr.] Blacklock somewhere (him not telling me). . . . [Mr.] Curtis told me he was in the car either in front or behind an[d] that the guy who died was basically bull[y]ing [Mr.] Blacklock the whole trip. An[d] that [Mr.] Williams slapped [Mr.] Blacklock. I [don't] know exactly when an[d] [Mr.] Blacklock was a [guinea] pig.

ROA Vol. I at 109.

The letter from Ms. Baker explains that she "volunteered to assist [Mr. Blacklock] in gathering information concerning his case." ROA Vol. I at 107. Although it is unclear from the letter what the relationship is between Ms. Baker and Mr. Blacklock, an email from one of Mr. Blacklock's previous attorneys states that Ms. Baker is Mr. Blacklock's friend.

13

The letter explains that almost a year prior, Ms. Baker had called Mr. Nesbitt to discuss Mr. Blacklock. The letter continues,

> I explained [to Mr. Nesbitt] the reason for my call and that I was looking for the statement that he was willing to provide [Mr. Blacklock] concerning a conversation that [Mr. Nesbitt] was part of while playing cards. [Mr. Nesbitt] told me that he was playing cards with what I assumed at first was "Z" and his boys but was actually Z's boys, Z being [illegible] what he told me but Ziahdrick. He didn't mention names of people playing cards, he told me that the conversation was about [Mr. Blacklock] being on a trip with the guys and that [Mr. Blacklock] was not supposed to come back from the trip alive. He was telling me how he didn't think it was right for [Mr. Blacklock] to be charged with murder when they would have killed him. I did not memorize the conversation with [Mr. Nesbitt] because he told me that he would gladly write a statement stating exactly what he had told me but with more detail. I assumed that my conversation with him was only to provide him with an address and name to send his statement to. He did tell me that he would do anything to help [Mr. Blacklock] because he was protecting himself. I have put these phrases in my words because he said things such as "the dude did what he had to man", I do not know exactly how it was phrased to me. He said that [Mr. Blacklock] was not supposed to make it home. He also said he didn't think it was right for [Mr. Blacklock] to be in jail when he was innocent and that was why he wanted to help.

*Id.*

The district court had doubts about whether the affidavit and Ms. Baker's letter were reliable evidence. But assuming they were reliable, the court concluded they were insufficient to support an actual innocence claim for two reasons. First, Mr. Nesbitt's statements occurred after the stabbing, so they could not have contributed to Mr. Blacklock's subjective belief that deadly force was necessary. And second, the court considered all the evidence and concluded Mr. Nesbitt's statements would not have made a material difference at trial. Neither of these conclusions is reasonably debatable.

14

First, it is undisputed that the conversations Mr. Nesbitt would have testified about occurred after the stabbing and thus could not have influenced Mr. Blacklock. Second, even assuming Mr. Nesbitt's affidavit and Ms. Baker's letter are reliable, they are weak evidence of the alleged plot to kill Mr. Blacklock. In his affidavit, Mr. Nesbitt states only that Mr. Curtis said they were supposed "to leave [Mr.] Blacklock somewhere," that Mr. Williams was "bull[y]ing" Mr. Blacklock "the whole trip," and that at some point Mr. Williams "slapped" Mr. Blacklock. ROA Vol. I at 109. The affidavit does not state that Mr. Curtis and Mr. Williams were planning to kill anyone. Conversely, the letter from Ms. Baker does state that Mr. Nesbitt played cards with some men who said Mr. Blacklock "was not supposed to come back alive." *Id.* at 107. But Ms. Baker did not know who made these statements to Mr. Nesbitt—he attributed them only to "Z's boys." *Id.* Moreover, Ms. Baker wrote the letter almost one year after her conversation with Mr. Nesbitt, and she admitted that she "put these phrases in [her] words" and that she did "not know exactly how it was phrased to [her]." *Id.*

For these reasons, Mr. Nesbitt's affidavit and Ms. Baker's letter would have added little to the evidentiary picture.[5] And as the district court concluded, a "holistic review of all" the evidence shows that the little value this evidence does add is insufficient to support an actual innocence claim. *Id.* at 713. We review that evidence now to demonstrate why the district court's conclusion is not reasonably debatable.

---

[5] And for these same reasons, we share the district court's doubt that Mr. Nesbitt's affidavit and Ms. Baker's letter are reliable.

At trial, there was some evidence supporting Mr. Blacklock's self-defense theory—namely, Mr. Blacklock testified that he saw the outline of a pistol in Mr. Williams's pocket and that he believed Mr. Williams was reaching into his pocket to draw the pistol. Moreover, other witnesses corroborated that Mr. Williams made statements like "His home boy killed my home boy and he was about to do me" and "They were about to kill me at the next convenience store." ROA Vol. II at 2274. This evidence supported Mr. Blacklock's argument that he subjectively believed deadly force was necessary.

However, self-defense "requires an imminently dangerous situation," and the district court identified evidence showing there was no *imminent* danger. ROA Vol. I at 712. For example, Mr. Curtis testified that he had everyone show they were not carrying a gun, and in his interviews with law enforcement, Mr. Blacklock did not mention Mr. Williams having a gun. Mr. Blacklock later claimed there was a gun and that Trooper Smith took it, but Trooper Smith denied even approaching Mr. Williams, let alone taking a gun. Additionally, Mr. Blacklock confirmed that although he believed Mr. Curtis had killed Mr. Eakin while driving, he did not see any evidence of a killing, nor did he see signs of a struggle. Mr. Blacklock also suffered only minor injuries from his own knife, while Mr. Williams had over nineteen wounds. And Mr. Blacklock confirmed that he chased Mr. Williams after the stabbing. Lastly, Mr. Blacklock made statements suggesting he was not motivated by a fear of imminent danger: "He was nodding off on the road, trying to go to sleep on the road so I put him to sleep on the road," "Actually, I would have been mad if he would have been alive. I would have been

– he doesn't even deserve the next breath," "I don't have a problem killing trash but I don't understand why I can't kill this fool," and "I don't know, man, I just flipped out." ROA Vol. II at 2045; ROA Vol. III at 901–03.

Considering this evidence—in addition to Mr. Williams's assault conviction—the district court concluded that Mr. Nesbitt's statements did not make it more likely than not that a reasonable juror would have concluded Mr. Blacklock acted in self-defense. Reasonable jurists would not disagree with this conclusion, particularly because Mr. Nesbitt's statements would have added little to the evidentiary picture and because "tenable actual-innocence gateway pleas are rare." *Perkins*, 569 U.S. at 386

\* \* \*

For these reasons, we conclude that reasonable jurists would not disagree with the district court's conclusion that Mr. Blacklock failed to make a credible showing of actual innocence.

### III.    CONCLUSION

We DENY Mr. Blacklock's request for a COA and DISMISS this matter.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

17